STATE of Iowa, Appellee,

v.

Montez SHORTRIDGE, Appellant.

No. 96–2095.

Court of Appeals of Iowa.

Oct. 29, 1998.

Patricia M. Hulting of Roehrick, Hultin, Blumberg, Kirlin & Krull P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Melodee Hanes, Jim Ward, and Odell McGhee, Assistant County Attorneys, for appellee.

Heard by CADY, C.J., and STREIT and VOGEL, JJ., but decided by SACKETT, P.J., and STREIT and VOGEL, JJ.

STREIT, J.

Montez Shortridge appeals the judgment and sentence following his conviction for first-degree murder. He claims there was insufficient evidence to support the jury's verdict, the district court erred by admitting hearsay testimony, his due process rights were violated when the district court admitted prior bad acts evidence, and the district court erred by failing to give a limiting instruction on the prior bad acts evidence. We affirm the district court.

### I. Background Facts & Proceedings.

Greg Peterson was brutally beaten to death in his home on August 13, 1994. Peterson operated an outcall/prostitution service from his mobile home in which he received an agency fee for appointments he made between women and their customers. Shortridge also operated such a service.

Pursuant to a plea agreement, Orlando Proctor told how Peterson was killed. He testified as follows: Montez Shortridge, Orlando Proctor, and Rick Benton, Jr., planned to break into Peterson's home to steal $10,000. They changed into dark clothing, drove to Peterson's home, and entered the unlocked door. Proctor immediately began searching the living room and kitchen for the money. While he was searching, he heard noises coming from the bedroom. Benton entered the living room, removed an electrical cord from a lamp, and returned to the bedroom. Peterson ended up lying naked on the bedroom floor with his hands and feet bound with electrical cords. Shortridge was standing over Peterson "breathing ... heavily" with his hands "balled" into fists. After leaving Peterson's home, the group stopped at a pay phone and made two 911 calls reporting a disturbance at Peterson's residence.

The police discovered Peterson's dead, badly beaten body on the bathroom floor. Dr. Thomas Bennett, in performing an autopsy on Peterson, determined two particularly severe blows to the head led to his death. While the time of death is generally difficult to pinpoint, the time of Peterson's death likely occurred between midnight and five a.m. on August 13, 1994.

Jheri Hatten lived with Shortridge and worked for him as a prostitute at the time of the murder. She testified during an offer of proof outside of the jury's presence. Her videotaped testimony was later played to the jury, but the videotape was not formally admitted as an exhibit. Hatten testified Shortridge bailed her out of jail on August 13, 1994. When he bailed her out she noticed he had a gold ring, a dark cellular phone, and a lot of money. After they arrived at their apartment, she discovered a bag of dark, dirty clothing which she described as smelling dirty or like spoiled meat. While watching a day-time television news broadcast with Shortridge, Peterson's picture appeared. Shortridge told Hatten, "he didn't look like that when I was through with him." Although Hatten testified the news broadcast occurred during the day of August 13, the jail records indicate she was not released until 5:46 p.m. on August 13.

Buffy Bieghler, Proctor's girlfriend, testified she overheard Proctor and Shortridge planning a burglary. She also testified Proctor was upset when he came home following the incident and told her, while crying, "Montez wouldn't quit beating on him."

While Shortridge was in jail, he wrote a series of letters to his friend, Michael Morris, asking Morris to provide an alibi for him

during the time of the murder. In one letter Shortridge wrote, "nobody knows the time of death but me and Jr."

Following a jury trial, Shortridge was convicted of first-degree murder. He was sentenced to life imprisonment. Shortridge appeals.

## II. Sufficiency of Evidence.

Shortridge contends insufficient evidence existed to support the jury's verdict.

Our standard of review for claims of insufficient evidence is well established. We review such claims for errors at law. Iowa R.App. P. 4.; *State v. Nichols*, 572 N.W.2d 163, 163 (Iowa App.1997). A verdict of guilty is binding on appeal unless no substantial evidence in the record exists to support it, or it is clearly against the weight of the evidence. *State v. Forsyth*, 547 N.W.2d 833, 834 (Iowa App.1996). Substantial evidence means evidence that could convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *State v. Maghee*, 573 N.W.2d 1, 10 (Iowa 1997).

In determining the sufficiency of the evidence, we view the record in a light most favorable to the State. *State v. Milner*, 571 N.W.2d 7, 10 (Iowa 1997). All evidence is considered, not merely the evidence supporting the verdict. *State v. Walker*, 538 N.W.2d 316, 319 (Iowa App.1995). Direct and circumstantial evidence is equally probative. Iowa R.App. P. 14(f)(16). Although a jury verdict can rest on circumstantial evidence, the evidence must raise a fair inference of guilt as to each element of the crimes. *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992). Additionally, discrepancies in testimony do not, in and of themselves, preclude proof beyond a reasonable doubt. *See generally State v. Phanhsouvanh*, 494 N.W.2d 219, 223 (Iowa 1992) (jury could adopt evidence it found credible); *Forsyth*, 547 N.W.2d at 836 (jury's function to determine credibility and resolve conflicts in evidence).

Iowa Rule of Criminal Procedure 20(3) provides:

A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Corroborative evidence may be direct or circumstantial. *State v. Bugely*, 562 N.W.2d 173, 176 (Iowa 1997). We have also determined a small amount of corroborative evidence is all that is required. *State v. Palmer*, 569 N.W.2d 614, 616 (Iowa App. 1997). Further, while corroborative evidence need not be strong or confirm every detail of the accomplice's testimony, it must nonetheless furnish some material fact tending to connect the defendant to the crime, lending support to the accomplice's credibility. *State v. Taylor*, 557 N.W.2d 523, 528 (Iowa 1996).

Shortridge's first assertion is there was a lack of physical evidence connecting him to the crime. He maintains the medical evidence supported his theory the beating was brutal and short, rather than the long beating described by Proctor and Bieghler. He further claims Proctor's testimony lacks sufficient corroboration. Shortridge next claims Jheri Hatten's testimony should not be considered on appeal and, alternatively, her testimony does not provide substantial evidence of his guilt. He also contends evidence of the 911 calls, the bag of clothing, property taken from Peterson, his letters attempting to set up an alibi defense, and the time of death do not amount to substantial evidence to support the jury's verdict.

When taken as a whole, we find substantial evidence to support the jury's verdict. First, the medical evidence as well as the testimony of Proctor and Bieghler provide substantial evidence from which a jury could find Shortridge guilty of first-degree murder. Dr. Bennett testified Peterson received injuries to the mouth, face, head, armpit, abdomen, and groin area. He determined two particularly severe blows led to his death. Dr. Bennett's testimony is consistent with Proctor's description of the beating. Proctor's description was also corroborated by Biegh-

ler's statement that Proctor told her, "Montez wouldn't quit beating on him."

In addition to the physical evidence, Jheri Hatten's testimony corroborates Proctor's statements and provides substantial evidence of Shortridge's guilt.[1] Although Hatten stated she watched a news broadcast with Shortridge during a time jail records indicate she was still incarcerated, the jury could reasonably infer either Hatten or the jail records were mistaken as to their timing. Looking at this inconsistency and Hatten's testimony as a whole, we conclude her testimony supports the jury's findings of guilt when viewed in a light most favorable to the State.

The 911 calls and the property taken from Peterson also provide substantial evidence of Shortridge's guilt. Two 911 calls made during the early morning hours of August 13, 1994, corroborate Proctor's testimony that following the murder, he, Benton, and Shortridge made two phone calls reporting a disturbance in the area of Peterson's residence. While the actual timing of these calls differs from Proctor's estimation, Proctor stated he did not know the specific time the burglary took place. Nevertheless, the calls corroborate Proctor's testimony, and support the jury's finding of guilt.

Furthermore, evidence of a bag of dirty clothing consistent with that worn by Shortridge, Proctor, and Benton supports the jury's verdict. Proctor testified they put the clothing in a bag. Hatten later corroborated this testimony by describing the bag and clothing. While there is some conflict in the evidence regarding the location of the clothes at various points, the existence and description of the clothing clearly corroborate Proctor's testimony and indicate Shortridge's involvement in the crime.

The letters written by Shortridge to Morris provide additional evidence supporting the theory Shortridge killed Peterson. In the letters, Shortridge gave Morris details of times they were together. In one letter he stated, "After I have all the info I need, then I'll piece together the alibi like hi-tech clockwork ... you'll get your script tomorrow night." He also encouraged Morris to write the information down in his own handwriting and stated only he and Benton ("Jr.") knew the time of death. Shortridge's letters not only indicate he was attempting to convince Morris to lie for him, they also reveal Shortridge knew the time of Peterson's death. We therefore find these letters provide substantial evidence Shortridge killed Peterson.

Finally, Dr. Bennett's testimony concerning the time of death indicates Shortridge could have killed Peterson. Dr. Bennett testified the time of death likely occurred between midnight and five a.m. Proctor was not keeping track of time during the burglary and murder. Proctor's estimation of the time is therefore not as reliable as the other evidence of the time of death. Even considering Shortridge's alibi defense, viewing the evidence in a light most favorable to the State, the testimony concerning the time of death provides a window of time in which Shortridge could have killed Peterson.

We have considered all of Shortridge's sufficiency of the evidence claims and find substantial evidence exists in the record to support his conviction.

### III. Bieghler Testimony.

Shortridge claims the district court erred by admitting hearsay statements from Buffy Bieghler.

On appellate review of an evidentiary ruling we grant the district court wide latitude regarding admissibility and will disturb the court's ruling only upon finding an abuse of discretion. *State v. Sallis*, 574 N.W.2d 15, 16 (Iowa 1998). We review constitutional issues de novo. *State v. Ross*, 573 N.W.2d 906, 910 (Iowa 1998).

Relevant evidence has "any tendency to make the existence of any fact that

---

1. We find no merit in Shortridge's argument that we should not consider Hatten's testimony on appeal. An Iowa Supreme Court order was entered on this matter recognizing the videotaped testimony was played to the jury and suggesting a transcript of the videotape could be obtained from a court reporter in order to obtain a reliable reproduction of the record. Regardless of whether the videotape was admitted as an exhibit, the testimony the jury heard nonetheless became a part of the record.

is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 401. "Although relevant, evidence may be excluded it its probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 403. ·

 "Hearsay" is a statement, other than one made by the declarant, while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Iowa R. Evid. 801. Iowa Rule of Evidence 803(2) provides hearsay is admissible as an excited utterance when a statement is made "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The excited utterance exception to the hearsay rule generally applies to statements made under the influence of the excitement of an incident rather than upon reflection or deliberation. *State v. Tillman*, 532 N.W.2d 482, 484 (Iowa App.1995). Excited utterances also need to be spontaneous in order to guarantee they are made under the influence of the incident rather than after deliberation. *Id.*

 He first asserts the trial court erred by allowing Bieghler to testify she overheard Proctor and Shortridge planning a robbery. He points out Bieghler did not identify the speaker. He further claims the statement was irrelevant, and primarily used to show his general propensity to commit wrongful acts. He further asserts his Fifth, Sixth, and Fourteenth Amendment rights were violated by the admission of this evidence.

 The robbery-planning conversation overheard by Bieghler was relevant to the motive in this case. Proctor explained Peterson was killed while they were attempting to rob him. Bieghler's statement is therefore directly relevant to Peterson's death. Furthermore, the statement is not hearsay because it is either an admission by a party-opponent, *See* Iowa R. Evid. 801(d), or a verbal act. A verbal act is a statement which has an independent legal significance. Even though it would be inadmissible hearsay if offered to prove the truth of any definitive matter asserted therein, it is never-

theless admissible when offered to show merely the statement was made. That is, it is admissible when offered for purposes of its independent legal significance. *Brown v. Iowa Legislative Council*, 490 N.W.2d 551, 554, (Iowa 1992); *State v. Rush*, 242 N.W.2d 313, 319 (Iowa 1976). Shortridge's concerns about the consistency between Bieghler and Proctor's statements, as well as whether Bieghler was referring to a different robbery, go to the weight of the evidence rather than its admissibility.

Shortridge also claims the trial court erred by admitting Bieghler's testimony that Proctor told her "Montez wouldn't quit beating on him." He maintains the statement was inadmissible hearsay and lacks reliability to be admitted under the excited utterance exception. He asserts it was unreliable because the statement was made from an accomplice to his girlfriend. He also claims the statement lacks reliability because Bieghler could not establish when the statement was made and the statement was not spontaneous.

 Proctor made the statement to Bieghler while "crying hysterically." This clearly indicates he was under the stress of excitement caused by a startling event and his reaction was spontaneous. Bieghler testified she had never before seen Proctor behave in this way. Although Bieghler could not pinpoint the exact date Proctor made the statement, she testified he made the statement shortly before she heard Peterson had been killed. Regardless of Bieghler's status as Proctor's girlfriend, we find her statements are reliable and note there is no requirement an excited utterance is only reliable when made to certain individuals. We find Bieghler's statements properly fall into the excited utterance exception and the district court did not abuse its discretion in admitting the testimony.

In regard to Shortridge's constitutional objections, he did not raise the concerns at trial, and, for that reason, these arguments are waived. *See State v. Kinkead*, 570 N.W.2d 97, 102 (Iowa 1997).

### IV. Jury Instructions.

Shortridge contends the district court erred by failing to sua sponte issue a limiting

instruction to the jury regarding the other crimes evidence.

It is well established that a party may not sit by and permit the trial court to commit inadvertent error without protest, and then complain for the first time on appeal. *State v. Lyon*, 223 N.W.2d 193, 194 (Iowa 1974) (holding defendant could not raise objection on appeal that trial court should have sua sponte provided jury instruction where defendant did not object to the instructions at trial). Accordingly, we find Shortridge failed to preserve error on this issue.

### V. Prior Bad Acts.

Shortridge contends the district court erred by admitting evidence he was a pimp.[2] He claims his due process rights were violated by the admission of this evidence.

We review Shortridge's evidentiary claims for an abuse of discretion. *Sallis*, 574 N.W.2d at 16.

Evidence of prior bad acts is not admissible to show a general propensity to commit wrongful acts. *State v. Haskins*, 573 N.W.2d 39, 45 (Iowa App.1997). Evidence of prior bad acts may be admitted, however, for one or more of the nonexclusive purposes listed in Iowa Rule of Evidence 404(b). *Id.* Iowa Rule of Evidence 404(b) provides:

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The list of admissible "other purposes" in rule 404(b) is not exclusive. *State v. Brown*, 569 N.W.2d 113, 116 (Iowa 1997). Instead, the key to determining admissibility depends upon "whether the challenged evidence is relevant and material to some legitimate issue other than a general propensity to commit a wrongful act." *Id.* (quoting *State v. Uthe*, 542 N.W.2d 810, 814 (Iowa 1996)). Evidence immediately surrounding the offense is admissible in order to show the complete story of a crime, even when it shows commission of another crime. *State v. Veal*, 564 N.W.2d 797, 812 (Iowa 1997).

Shortridge claims evidence he was a pimp and he kept his prostitutes fees should not have been admitted into evidence, and any relevance was outweighed by unfair prejudice. He further contends the evidence demeaned him as a "bad" pimp because he kept all the money, rather than sharing the haul as a "good" pimp would do. He also maintains this evidence does not fall into a rule 404(b) exception. Finally, he asserts the admission of this evidence is particularly prejudicial because he is a black male and one of his former prostitutes is a white female.

The State presented evidence of two motives for Peterson's murder. First, circumstantial evidence indicated Peterson may have been killed because of a rivalry between outcall services.[3] Second, he may have been killed in an effort to take $10,000 from his home.

Evidence of Shortridge's involvement in prostitution is not only relevant to a motive for Peterson's killing, it is also relevant to establishing the relationship between the parties involved in this case. *See Veal*, 564 N.W.2d at 812. This evidence therefore properly falls into the rule 404(b) motive exception. Regardless of the racial makeup of Shortridge and the witnesses, the evidence of his participation in the prostitution business was nonetheless relevant to the case. The probative value of this evidence outweighs any unfair prejudice. We find the district court did not abuse its discretion by admitting evidence of Shortridge's involvement in the prostitution business.

---

**2.** A pimp is a man who controls prostitutes and arranges clients for them, taking a percentage of their earnings in return.

**3.** Michael Crandall worked for Peterson answering phone calls and setting up appointments. Crandall testified prior to Peterson's death, his business had been decreasing due to competition. Rick Benton, Jr., Peterson's former business partner, operated his own outcall service following a disagreement with Peterson. Shortridge also operated an outcall service.

Shortridge also contends the trial court erred in admitting evidence of his involvement in two burglaries shortly before Peterson's murder and that admission of the prior bad acts testimony violates his due process rights. However, because Shortridge did not object on these grounds at trial, he has not preserved these claims for appeal.

### VI. Ineffective Assistance of Counsel.

Shortridge claims he received ineffective assistance of trial counsel because of counsel's failure to: (1) object to Proctor's testimony of prior burglaries; (2) object on the ground of due process; and (3) request a limiting instruction.

 Ordinarily, ineffective assistance of counsel proceedings are preserved for postconviction proceedings. *State v. Buck,* 510 N.W.2d 850, 853 (Iowa 1994). These claims may be resolved on direct appeal, however, when the record adequately addresses the issues. *State v. Ray,* 516 N.W.2d 863, 865 (Iowa 1994). A claim of ineffectiveness of counsel is an exception to the general rule that an issue must be raised timely and adequately in order to preserve error for appeal. *Earnest v. State,* 508 N.W.2d 630, 632 (Iowa 1993).

The record in this case is insufficient for us to address Shortridge's claims on appeal. The record does not indicate why counsel failed to object to evidence of prior burglaries or why counsel failed to request a limiting instruction. In order to allow Shortridge's counsel to explain the trial decisions, we preserve his ineffective assistance of counsel claim for postconviction relief.

**AFFIRMED.**